No. 48,118

(559 P. 2d 347)

TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA; AMERICAN PETROFINA, INCORPORATED; AMERICAN PETROFINA COMPANY OF TEXAS; THE K-T OIL CORPORATION; JERRY A. EWY; WENDELIN HERMAN; TONY HERMAN; HERMAN OIL CO., INC.; ETHEL CERO and DEAN L. CERO, Co-administrators of the Estate of John Edward Cero, Deceased; ETHEL CERO, as an Individual; EDWARD J. CERO, An Individual Doing Business As CERO's PROVINCIAL CANDY SHOPPE, *Appellees*, v. THE CITY OF WICHITA, KANSAS, A MUNICIPAL CORPORATION, *Appellant*.

**326**

Opinion filed January 22, 1977.

*Phillip Mellor,* of Holmes, Darrah and Mellor, of Wichita, argued the cause and was on the brief for the appellant.

*James B. McKay, Jr.,* of McKay and McKay, of El Dorado, argued the cause, and *J. B. McKay,* of the same firm, was with him on the brief for the appellees, Teachers Insurance and Annuity Association of America; American Petrofina, Incorporated; American Petrofina Company of Texas; The K-T Oil Corporation and Jerry A. Ewy.

*Harry W. Saums,* of Saums and Grant, of Wichita, argued the cause, and *Russell E. Grant,* of the same firm, was with him on the brief for the appellees, Ethel Cero, an individual, and Edward J. Cero, an individual, doing business as Cero's Provincial Candy Shoppe.

*John P. Woolf,* of Martin, Pringle, Schell & Fair, of Wichita, argued the cause, and *Lee Thompson,* of the same firm, was with him on the brief for the appellees, Wendelin Herman, Tony Herman and Herman Oil Co., Inc.

The opinion of the court was delivered by

SCHROEDER, J.: This is an appeal from the trial court's order in a declaratory judgment action, wherein the trial court held the action of the City of Wichita in changing Kellogg Street to a fully controlled access highway facility constituted a taking of private property for public use, therefore requiring the payment of compensation to landowners and others with an interest in the property who lost their existing access to Kellogg Street and highways.

Pursuant to K. S. A. 1975 Supp. 60-2701, Rule 6 (*o*), the appeal herein is submitted on an agreed statement of the parties. The

points asserted require the court to examine issues involving loss of access to property abutting public streets or highways.

The City of Wichita (defendant-appellant) is a municipal corporation located in Sedgwick County. Teachers Insurance and Annuity Association of America, American Petrofina, Incorporated, American Petrofina Company of Texas, The K-T Oil Corporation, and Jerry A. Ewy (plaintiffs-appellees) are respectively, the owner, lessee with option to purchase, assignee of lease, and sublessees of a service station on the south side of Kellogg Street designated as Tract 1 herein. Wendelin Herman, Tony Herman and Herman Oil Co., Inc., (plaintiffs-appellees) are the owners and lessees of a service station on the south side of Kellogg Street designated as Tract 2 herein. Ethel Cero and Dean L. Cero, co-administrators of the Estate of John Edward Cero, deceased, Ethel Cero, as an individual, and Edward J. Cero, an individual doing business as Cero's Provincial Candy Shoppe (plaintiffs-appellees) are the owner and tenant of a candy shop on the south side of Kellogg Street designated as Tract 3 herein. Each of the three tracts had direct access to both Kellogg Street and a side street prior to the action taken by the city.

Kellogg Street (also U. S. Highway 54 and State Highway 96) is a major trafficway which runs east to west through the City of Wichita. Kellogg Street heretofore accommodated two lanes of eastbound traffic and two lanes of westbound traffic. There were no median strips or left turn prohibitions to prevent access to and from the plaintiffs' properties for westbound traffic. The plaintiffs' properties were easily accessible to patrons approaching from any direction, and the plaintiffs' properties abutting Kellogg Street and highways had direct access thereto.

Major highway projects are in progress in Wichita, and the instant project is part of an overall plan of improvement. The State Highway Commission, acting within the scope of its authority, proposed to change Kellogg Street to a fully controlled access facility. That portion of Kellogg Street on which plaintiffs' properties front is included in plans which involve construction of a fully controlled access highway facility, and a change in Kellogg Street from a through highway to a five block service street to be called Kellogg Drive. Under this plan, plaintiffs do not have direct access to the new highway. The five block Kellogg Drive will not be a "frontage road" as that term is defined in K. S. A. 1975 Supp. 68-1901 (c) and will not furnish any access to the newly improved highway.

No part of plaintiffs' properties will be directly taken for inclusion on the new highway. The construction will, instead, result in the following physical changes to Kellogg Street and highways:

"(a) Through highway traffic will be diverted to a new section of highway which extends ten blocks to the east of the properties and for all practical purposes, continuously to the west of plaintiffs' properties.

"(b) Said highway will be relocated approximately 90 feet north of its present location and will be elevated approximately 3.5 feet above its present grade. . . .

"(c) Kellogg Drive abutting plaintiffs' properties will be narrowed to two lanes and will carry both eastbound and westbound traffic. Side streets abutting plaintiffs' properties will continue to do so extending south from Kellogg Drive, although plaintiffs' side of Kellogg Drive will have no direct communication to the side streets lying north of the reconstructed highway.

"(d) Access to and from plaintiffs' properties on the abutting streets, that is, Kellogg Drive and side streets will be the same as at present, that is, driveway location and width will be unchanged but plaintiffs' properties will have no direct access to reconstructed Kellogg Street and highways.

"(e) Kellogg Drive abutting plaintiffs' properties will extend only . . . a distance of 5 blocks."

Under the new plan, patrons using the improved highway wishing to reach plaintiffs' properties will have four options. Eastbound traffic on the new fully controlled access highway may enter the Canal Route Interchange (approximately three-fourths of a mile west of plaintiffs' properties) and travel south approximately one-half mile to Lincoln Street, through the Lincoln Street Interchange, thence east approximately three-fourths of a mile to Erie Street, thence north approximately one-half mile to plaintiffs' properties, a distance of 1.75 miles which the city stipulates is not a practical approach to plaintiffs' properties; or the eastbound traffic may travel past plaintiff's properties to the Hillside Interchange and backtack by means of a tortuous and circuitous route to reach plaintiffs' properties, resulting in a distance of 1.44 miles to get to plaintiffs' properties and back to the new access controlled highway. Westbound traffic on the new fully controlled access highway may enter the Hillside Interchange, before they can see the plaintiffs' properties, and travel an additional 1.34 miles to patronize plaintiffs' properties and regain access to the new access controlled highway; or westbound traffic may travel past plaintiffs' properties and exit at the Grove Interchange and travel a circuitous route approximately an additional two miles to patronize plaintiffs' properties and regain access to the new roadway.

The plaintiffs contend the construction of the project under the

new plan constitutes a taking of their rights of access to a through street, Highway 54, Highway 96, and through traffic, that they have special private rights therein, that the circuity of travel under the new plan is unreasonable, that the project exceeds the constitutional limits imposed on the valid exercise of the police power and results in a taking of their private properties for public use, and that the city should pay just compensation. They further contend that their properties are also damaged by some of the factors mentioned in K. S. A. 26-513(d), specifically factors No. 5 and No. 11.

The defendant contends this is a valid exercise of the police power and of the power to construct, control, alter and vacate streets and portions of streets; that plaintiffs have no vested interest in the traffic of the highways; that the plaintiffs and their patrons will have the same street access to abutting streets as heretofore except and less that which may be imposed as a valid exercise of the police power; that the power of the city includes the power to narrow streets, shorten streets and divert through traffic to other streets; that the relocation of Kellogg Street and its highways creates a new controlled access highway where none previously existed and that there is no taking of access to such highway where none previously existed; that the damage to plaintiffs' properties is merely consequential, common to all owners of property similarly situated; that since no part of plaintiffs' properties is being taken, there is no obligation to pay compensation.

The trial court in its journal entry of judgment determined, adjudged and decreed:

". . . [T]hat the widening and improving of existing Kellogg Street, U. S. Highway 54 and State Highway 96 as a controlled access facility will result in a substantial impairment of, and unreasonable interference with, plaintiffs' right of access to existing Kellogg Street, U. S. Highway 54 and State Highway 96. Plaintiffs will suffer a loss which constitutes a taking of private property for public use. This taking exceeds the scope of the State's and City's police power and, therefore constitutes a taking of property for which compensation must be paid."

Appeal has been duly perfected from the foregoing order.

The basic question for determination in this case is whether there has been a compensable taking of access from the plaintiffs upon the stipulated facts in this case.

The appellant contends the instant case is one of first impression in Kansas. Although this court has not dealt with the precise facts here presented, it has long ago considered many cases of this kind and established the rules of law that control the decision.

It must be conceded the state, subject to constitutional limitations, has absolute control over the streets and highways within its boundaries. The state may exercise this control either by the use of its police power or the power of eminent domain. At the same time, it is recognized in the law of this state that the right of access to and from an existing public street or highway is one of the incidents of ownership of the land abutting thereon. It is a property right which may not be taken from the owner by the public without his consent, except upon payment of full compensation and due process of law. (*Smith v. State Highway Commission,* 185 Kan. 445, 346 P. 2d 259; and *Brock v. State Highway Commission,* 195 Kan. 361, 404 P. 2d 934.)

These basic premises in the law have invoked much controversy with respect to the balance between the use of the state police power and the power of eminent domain. In nearly all of the decisions in this jurisdiction and in other jurisdictions, the state has contended that its actions were within the scope of the proper exercise of its police power, and the landowner has contended that the state has exceeded its police power and must pay just compensation under the procedures of eminent domain or its equivalent. The instant case is no exception.

The city argues that "obviously the right to enter and leave the plaintiffs' premises by the public street system will remain." The city contends most of our previous cases have involved a physical taking of property or closing of access. Upon this premise the city argues because the portion of Kellogg Street immediately abutting the plaintiffs' properties remains unchanged no loss of access has occurred.

Our cases, hereafter discussed, clearly indicate there is no requirement that the land of an abutting property owner be taken by eminent domain or otherwise as a condition precedent to the maintenance of an action for damages to compensate for the loss of access taken from the abutting property owner. Our controlled access statute, K. S. A. 1975 Supp. 68-1901, *et seq.*, expressly contemplates compensation for the taking of an abutting landowner's right of access. (See *Smith v. State Highway Commission,* supra; and *Brock v. State Highway Commission,* supra.)

*Brock* recognized that a distinction must be made between the common law rules relating to rights of access adopted for application to conventional highways to meet local transportation needs, as distinguished from interstate highways, freeways and other

thoroughfares which were not known and which require controlled access facilities for public safety and convenience. In the opinion the court said:

"Regardless of the source of origin there has developed a universal rule that the owner of land abutting on a street or highway has a private right in such street or highway, distinct from that of the public, which cannot be taken or materially interfered with without just compensation. However, the rights of an abutting owner must be subordinated to the right of the public to the proper use of the highway and the right of governmental agencies to enforce proper police regulation. The right is subject to reasonable regulation and restrictions for the purpose of providing reasonable safe passage for the public, but the regulations or limitations cannot be enforced where they unduly limit or unreasonably interfere with the rights of the abutting owners. The established easement which has been used for access purposes cannot be taken without compensation, but, while the entire access may not be cut off, an owner is not entitled to access to his lands at all points in the boundary between it and the highway. If the owner has a free and convenient access to his property and to his improvements thereon, and his means of ingress and egress are not substantially interfered with by the public, he has sustained no compensable loss.

"In applying the above recognized rules the difficulty has arisen in determining, under the facts and circumstances of each particular case, just what is free and convenient access and what constitutes substantial interference. It must be understood that the rules were adopted and applied to conventional or land service roads. At the time the rules were developed roads were constructed largely for the benefit of the local property owners as land service roads and for the benefit of the local inhabitants. Speedways, interstate highways, freeways and other thoroughfares for the handling of long distance travel by controlling access were not anticipated. These roads are constructed today to serve the traveling public rather than the local needs of abutting property owners. . . .

\* \* \* \* \*

"Without entering into an extended discussion as to what does or does not constitute undue interference with access rights on a conventional or land-service highway we are forced to conclude that the doctrine granting a right of access to abutting landowners as developed for conventional or land-service highways does not have the same application to controlled access highways." (pp. 367-368, 369.)

As applied to a controlled access thoroughfare the court said:

"We adhere to the rule that the owners of abutting lands have a right of access to the public road system but it does not follow that they have a right of direct ingress and egress to and from a controlled access thoroughfare. The right of access, if it can be determined to be a right under such circumstances, *is the right to reasonable*, but not unlimited, access to and from the abutting lands.

"Although an abutting landowner has a right to use a highway he cannot be heard to say that he has been deprived of his right or compensably

damaged because he does not have direct access to a certain highway where public judgment dictates that access to and from the highway should be controlled and is subject to control under the police power of the state.

"The appellants complain that they do not have direct access from their property to the highway. The property abuts on a frontage or service road. Appellants have access to the frontage road at all points at which it abuts their property. There is no suggestion that the frontage or service road is not of proper quality. It is part of the state highway system. Appellants are granted access to the main highway at the east and west ends of their property. Appellee has constructed cross-over openings for their special use and benefit. Such cross-over openings are only 575 feet apart." (Emphasis added.) (p. 370.)

*Ray v. State Highway Commission,* 196 Kan. 13, 410 P.2d 278, *cert. denied,* 385 U. S. 820, 17 L. Ed. 2d 57, 87 S. Ct. 43, followed the *Brock* case by approximately six months. The rationale of *Brock* was discussed in *Ray* as follows:

"The substance of the holding in *Brock* is that the right of access of an abutting property owner upon a public street or highway is merely a right to reasonable, but not unlimited, access to and from the abutting property. As applied to controlled access facilities, where a frontage road is provided to which the abutting owners of property have direct access, and they have *reasonable access* from the abutting property via the frontage road to the through-traffic lanes of the controlled access highway, the abutters' rights of access have not been taken or appropriated by the State Highway Commission, but merely subjected to regulation under the police power of the state, and their damages, if any, are non-compensable.

"Where property owners are afforded complete ingress and egress to a frontage road upon which their property abuts, and they have *reasonable access* via the frontage road to the main traveled lanes of a controlled access highway, any inconvenience suffered by them is merely non-compensable circuity of travel. Under these circumstances, any decline that has occurred in the value of their property which is the result of a diversion of traffic is non-compensable. . . ." (pp. 18-19.)

In *Brock* a frontage road, which was a part of the highway system, provided the owners of land with access to the through-traffic lanes at the points of connection, only 575 feet apart. This was held as a matter of law to be a reasonable regulation of traffic within the police power of the state, acting through the State Highway Commission, and not compensable.

In *Ray* the points of connection from the frontage road to the through-traffic lanes of the controlled access facility were only 1,067.44 feet apart. One using the westbound traffic lanes on that controlled access facility would be required to make an exit 155 feet east of the east boundary of the landowners' property onto the frontage road and thereby gain access to the plaintiffs' prop-

erty. In leaving the plaintiffs' property one would be required to travel 714 feet west of the west boundary of the plaintiffs' property on the frontage road and there enter upon the main traveled westbound traffic lanes. This was held as a matter of law to be a reasonable regulation of traffic within the police power of the state as in *Brock.*

It is important to note that in both the *Brock* and the *Ray* cases the court was dealing with a controlled access highway established by the State Highway Commission pursuant to K. S. A. 68-1901 to 68-1906, inclusive. In both cases there was no taking of property by condemnation. The remedy asserted by the landowners was by way of an action for damages in the nature of a suit on implied contract, commonly known as an inverse condemnation action. The landowners in each case contended that the State Highway Commission had taken their right of access to a controlled access highway without obtaining the right of access by condemnation or otherwise. The facts in the *Brock* case indicate that it was in September 1951 that the State Highway Commission condemned the necessary land for the purpose of widening U. S. Highway 24. In the *Ray* case the State Highway Commission had condemned an easement for a highway right of way over a portion of the plaintiffs' property in the year 1952. It was not until the 1953 session of the Kansas legislature that K. S. A. 68-1901, *et seq.,* was enacted which specifically provided for the designation of controlled access facilities by the State Highway Commission. It was not until the highway was designated by the State Highway Commission as a controlled access facility and constructed in each of these cases that the plaintiffs filed their respective actions seeking compensation *for the loss of access* by reason of the limitations imposed upon them in gaining access to the main traveled thoroughfares.

The rule to be applied in the instant case is a corollary to the rule first announced in *Brock* and applied in *Ray.* The rule is that the right of access of an abutting property owner upon a public street or highway is merely a right of reasonable, but not unlimited, access to and from the abutting property. As applied to a controlled access facility which upgrades or improves a conventional street or highway, where no frontage road is provided to which the abutting owners of property have direct access, and they have no reasonable access from the abutting property via a frontage road to the through traffic lanes of the controlled access highway,

the abutters' rights of access have been taken or appropriated by the State Highway Commission, and their damages by reason of the loss of access are compensable.

On the stipulated facts in this case Kellogg Drive, which will front the plaintiffs' properties for a distance of five blocks after the highway project is completed, is not a "frontage road" as defined in K. S. A. 1975 Supp. 68-1901 (c). It provides:

" 'Frontage road' means a highway, road or street which is auxiliary to and located on the side of another highway, road or street for service to abutting property and adjacent areas and for control of access to such other highway, road or street."

Here Kellogg Drive will not furnish any access whatever to the newly improved Kellogg Street and highways. Abutting property owners entering upon Kellogg Drive with their motor vehicles must leave and use other roads or streets to gain access to the new limited access highway fronting their property at distant interchanges.

An annotation at 42 A. L. R. 3rd 13, 84 (1972) discusses cases dealing with the reasonableness of access as affected by the distance to the nearest opening of a frontage road to the express lanes of the controlled access highway. The cases cited in the annotation are split on whether compensation should be awarded when frontage roads of varying lengths permitting access to the controlled highway are involved. However, virtually every case involves a situation where "frontage roads" provided access of varying distances to the controlled access highways. Here long distances must be traveled on roads, other than Kellogg Drive, which are no part of a frontage road, in order to gain access to the controlled highway at interchanges on the highway. The circuity of travel in the instant case is such that reasonable men could not differ in finding it unreasonable.

While Kellogg Drive in the instant case is adjacent to the plaintiffs' properties and parallel to the new limited access highway, at no point does it permit entry onto the express lanes of the highway. Kellogg Drive which extends for a distance of five blocks parallel to the new highway terminates at its extremeties without permitting any access to the new controlled highway facility.

The city argues the owner of property abutting upon an existing street or highway does not have a vested right in the flow of traffic directly in front of his property. It must be conceded that the state or a city may abandon or re-route an existing street or highway away from the abutting landowners' property without any liability

to the owners of land abutting on the street or highway for the change in the flow of traffic. This was established in *Moore v. State Highway Commission,* 191 Kan. 624, 383 P. 2d 549, which held there is no taking of a right of access where a new controlled access highway is established through property where no highway previously existed. (See also *Ray v. State Highway Commission,* supra at 19; and *Brock v. State Highway Commission,* supra at 371.) That is not the situation facing the court in the instant case.

Thus, while the state is under no duty or obligation to send traffic past the plaintiffs' properties, as long as the traffic does pass the plaintiffs' properties they are entitled to avail themselves of it in common with other abutting property owners.

The plaintiffs in the instant case are not complaining about a loss of traffic which results from the building of a new highway which leads the traffic to the new route. The record here discloses the Squad Chief for the Consulting Services Design Department of the State Highway Commission, Dale L. McGregor, testified on cross-examination that it was his opinion this project is an upgrading of an existing highway and not the construction of a new highway. The stipulated facts support this testimony. Here an existing conventional highway was converted to a controlled access facility by action of the State Highway Commission on a part of the same right of way. The fact that the new highway is relocated approximately 90 feet north of its former location was necessitated to widen the easement for construction of the new facility.

In its brief the city fails to distinguish between the right of access and a right to traffic flow. The issue in this case is not whether the restricted access will cut down on the volume of the plaintiffs' businesses from the traffic flow. Rather, the issue is whether there has been a substantial impairment of, and an unreasonable interference with, plaintiffs' right of access to the adjacent highway by reason of the construction of the new controlled access facility to constitute a taking of private property for public use which is compensable.

Access may be defined as the right vested in the owner of land which adjoins a road or other highway to go and return from his own land to the road or highway without unreasonable interference. Such a right to be of any substantial utility must necessarily include the owner's invitees and licensees. (*Brock v. State Highway Commission,* supra; and *State v. Wilson,* 103 Ariz. 194, 438 P. 2d 760, 42 A. L. R. 3d 134 [1968].)

On the facts in the instant case we are dealing with two service stations and a candy shop. These business properties are dependent upon access to the new highway facility fronting these properties. In *McCall Service Stations, Inc. v. City of Overland Park*, 215 Kan. 390, 524 P. 2d 1165, the court stated:

".  .  . The value of a service station is dependent almost entirely upon the access the traveling public has to the service station." (p. 394.)

Analogous cases affecting abutters' rights of access in *conventional* highway improvement cases which held the restriction of access to be a compensable taking are *McCall Service Stations, Inc. v. City of Overland Park,* supra; and *Kohn Enterprises, Inc. v. City of Overland Park,* 221 Kan. 230, 559 P. 2d 77.

Whether the circuity of travel of the abutting property owners in the instant case to gain access via Kellogg Drive to the fully controlled access highway facility herein is unreasonable is a question of law to be determined by the trial court in the first instance. (*Brock v. State Highway Commission,* supra; and *Ray v. State Highway Commission,* supra.)

The trial court found the conversion of portions of the existing conventional highway, Kellogg Street, U. S. Highway 54 and State Highway 96, to Kellogg Drive, to which the plaintiffs will have access, will not provide them with reasonable access via Kellogg Drive to either lane of the fully controlled access highway facility when constructed.

On the stipulated facts in this case the trial court was correct.

On the record here presented the question of damages and the manner of determining the amount of damages are not before the court at this time.

The judgment of the lower court is affirmed.